UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

vs.


Patricia Ann Brown, a/k/a
Patricia Johns, a/k/a Trish,
a/k/a Tricia,

        Defendant.        Crim. No. 09-145 (JNE/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a general assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Suppress Evidence Obtained

as a Result of Search and Seizure.[1]  A Hearing on the Motion was conducted on June

---

[1] At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendant's Motion.  Leave was granted, and the last submission on the issues was received on July 24, 2009, at which time,

(continued...)

23, 2009, at which time, the Defendant Patricia Ann Brown appeared personally, and by Manvir K. Atwal, and Andrea K. George, Assistant Federal Defenders; and the Government appeared by Tricia M. Tingle, and Steven L. Schleicher, Assistant United States Attorneys. For reasons which follow, we recommend that the Defendant's Motion to Suppress Evidence be denied.

## II. Factual Background

The Defendant is charged with one (1) Count of Murder, in violation of Title 18 U.S.C. §§7, 1111, 1151, 1153(a), and 3559(f)(1); one (1) Count of Assault Resulting in Serious Bodily Injury, in violation of Title 18 U.S.C. §§7, 113(a)(6), 1151, 1153(a), and 3559(f)(3); and one (1) Count of Assault with a Dangerous Weapon, in violation of Title 18 U.S.C. §§7, 113(a)(3), 1151, 1153(a), and 3559(f)(3). Those alleged violations are said to have occurred on or about April 12, 2009, in this State and District, against three (3) juvenile victims -- J.T.M., F.J.W., and C.J.H.,

---

[1](...continued)
the Motion to Suppress was taken under advisement. See, Title 18 U.S.C. §3161(h)(1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).

respectively.  As pertinent to those charges, and to the Motion now before us, the operative facts may be briefly summarized.[2]

A.  <u>The Events of April 12, 2009</u>.  At the Hearing, the Government adduced the testimony of Josh Black Weasel ("Black Weasel"), who is a Patrol Officer with the Red Lake Police Department.  Black Weasel testified that he worked from 6:30 o'clock p.m., on Sunday, April 12, 2009, which was Easter Sunday, until 6:00 o'clock a.m., on Monday, April 13, 2009, and he further attested that the Red Lake Police Department received a high volume of calls during that twelve (12) hour period.  Just before 10:45 o'clock p.m., Black Weasel received a call from the dispatcher, who advised that a stabbing was in progress, at the residence of Rose Desjarlait ("Desjarlait"), which is in the Barton area of the Red Lake Indian Reservation.[3]

---

[2]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, <u>United States v. Moore</u>, 936 F.2d 287, 288-89 (6th Cir. 1991), cert. denied, 505 U.S. 1228 (1992); <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 610 (9th Cir. 1990).

[3]At the time of the Hearing, the Red Lake Police Department dispatch report was (continued...)

According to Black Weasel, he arrived at the Desjarlait residence at approximately 10:45 o'clock p.m., and Desjarlait advised him that F.J.W., and C.J.H., had been stabbed.[4]   Desjarlait let Black Weasel into her residence, where Black Weasel observed that both F.J.W., and C.J.H., were extremely distressed, with blood on their shirts.   Black Weasel further observed that F.J.W. had lacerations on his hands, and that his shirt had been torn.   Black Weasel then spoke briefly with F.J.W., and C.J.H., who advised that, earlier that evening, they went to visit K.K., who is the mother of F.J.W.'s child, and who lives with her father in the McBride area of the Red Lake Indian Reservation.   F.J.W. and C.J.H. reported that, upon their arrival at K.K.'s residence, F.J.W. was attacked by a group of four (4) females, including the Defendant, K.K., and Jennifer Fairbanks ("Fairbanks").   C.J.H. saw the assault on F.J.W., and tried to pull him back into their vehicle, at which time, he was also assaulted.

---

[3](...continued)
admitted as Defendant Exhibit 1, without objection by the Government.  During his testimony, Black Weasel averred that the automated time stamps on the dispatch report were erroneous, owing to a computer glitch.  However, he attested that the manually-entered time stamps were correct.

[4]In his testimony, Black Weasel averred that the dispatcher was either misinformed, or misunderstood some information, because the stabbing was not actually in progress at the time of the initial emergency call.

F.J.W., and C.J.H., informed Black Weasel that they had been stabbed during the course of the assault, as evidenced by their injuries, and the tear in F.J.W.'s shirt. However, F.J.W. and C.J.H. did not know which female had stabbed them. According to Black Weasel, F.J.W. and C.J.H. advised that the Defendant, K.K., and Fairbanks, were traveling in a blue Chevy Blazer. In fact, while Black Weasel was at the Desjarlait residence, F.J.W. saw the blue Chevy Blazer pass by the residence, traveling westbound on Highway 1. However, Black Weasel attested that none of the officers attempted to follow the blue Chevy Blazer at that time, nor did they report its location to the dispatcher, because all available officers were busy with other calls. According to Black Weasel, no officer was immediately dispatched to K.K.'s residence, for that same reason.[5]

During the course of Black Weasel's conversation with F.J.W. and C.J.H., F.J.W.'s parents arrived at the Desjarlait residence, in order to take their son to the hospital. In addition, Kendall Kingbird ("Kingbird"), who is a Sergeant with the Red Lake Police Department, and Officer LaPlant ("LaPlant"), who is an Officer with the Red Lake Police Department, also arrived at the Desjarlait residence. Black Weasel

---

[5]At the Hearing, Black Weasel testified that the Desjarlait residence is approximately six (6) miles, or a five (5) minute car trip, from K.K.'s residence.

advised both Kingbird, and LaPlant, of the stabbing, the identities of the suspects, and the description of the suspects' vehicle, based upon his interview with the alleged victims. F.J.W., and C.J.H., then left with F.J.W.'s parents for the hospital, and Black Weasel also left, after receiving a call from the dispatcher, concerning a suicidal male, who was reportedly walking around the Barton area.

While Black Weasel was looking for the suicidal male, he heard Kingbird over the police radio, advising that he had located the blue Chevy Blazer, at the residence of Yvette Lussier ("Lussier"), which is in the Barton area. Black Weasel traveled to the Lussier residence, where he observed that Kingbird had arrested the Defendant, and he further observed the blue Chevy Blazer, which was parked near the wooded area behind the residence.[6] On cross-examination, Black Weasel stated that he did not know if anyone else was home at the Lussier residence, at the time of the Defendant's arrest.

According to Black Weasel, Kingbird advised that the Defendant was the subject of an outstanding Tribal Warrant, although he did not specify the underlying offense. On cross-examination, Black Weasel confirmed that the Defendant was not

---

[6]At the time of the Hearing, Black Weasel identified the Defendant in the courtroom.

arrested, based upon her alleged involvement in the assault on F.J.W., and C.J.H., but he testified that, at the time of the Defendant's arrest, he knew that the Defendant was a suspect in that assault. Black Weasel then transported the Defendant to the Red Lake Jail for booking, while Kingbird remained at the scene. Black Weasel testified that he did not engage in any conversation with the Defendant, during that transport. Black Weasel did not stay with the Defendant during the booking process, because he had to respond to a shooting incident, but he advised the officers, at the Red Lake Jail, that the Defendant would need to be interviewed, with respect to the assault on F.J.W. and C.J.H. Black Weasel later followed up with F.J.W., and C.J.H., at the Red Lake Hospital, but they were unable to provide any additional information related to the stabbing.

At the Hearing, the Government also adduced the testimony of Kingbird, who attested that he worked, as a Patrol Officer, from 6:30 o'clock p.m., on Sunday, April 12, 2009, to 6:00 o'clock a.m., on Monday, April 13, 2009, and who confirmed that the Red Lake Police Department received a high volume of calls during that shift. Kingbird testified that he was initially called to the Lussier residence at approximately

7:53 o'clock p.m., after Lussier reported that her son was suicidal.[7]  However, upon Kingbird's arrival, Lussier advised that her son was fine, so Kingbird left to attend to other calls.  Subsequently, at approximately 10:30 o'clock p.m., Kingbird returned to the Lussier residence, after Lussier made a second emergency call for assistance with her son.  According to Kingbird, he knocked on the door of the Lussier residence, but there was no answer.

Kingbird then received a call from dispatch, about the stabbing of F.J.W. and C.J.H., so he traveled to the Desjarlait residence, where he arrived at approximately 10:45 o'clock p.m.  At that time, Desjarlait, F.J.W., C.J.H., Black Weasel, and F.J.W.'s parents, were all at the residence, and Kingbird overheard Black Weasel speaking to F.J.W., and C.J.H., who appeared distressed.  Kingbird testified that he heard F.J.W., and C.J.H., identify the Defendant and K.K. as their assailants, and he heard them describe the blue Chevy Blazer.  Kingbird also heard F.J.W.'s statement, that the blue Chevy Blazer had just driven by the Desjarlait residence.  Kingbird testified that he observed blood on F.J.W.'s shirt, as well as a tear in his shirt, but he could not recall any details about C.J.H.'s appearance.

---

[7]At the Hearing, Kingbird also testified that the automated time stamps on the dispatch report were erroneous, owing to a computer glitch, but he averred that the manually entered time stamps were accurate.  See, <u>Defendant Exhibit 1</u>.

According to Kingbird, he left the Desjarlait residence, in order to follow up on Lussier's call, concerning her suicidal son. Kingbird returned to the Lussier residence, where he pulled his squad car into the driveway, and observed a person at the door of the residence.[8] The person, who was later identified as the Defendant, began running toward the back of the residence, with a liquor bottle in her hand. Kingbird was able to maintain visual contact with the Defendant, while chasing after her on foot. Kingbird testified that he caught up to the Defendant, just as she reached the driver's door of the blue Chevy Blazer, which was parked behind the residence. See, Government Exhibit 7.[9] Kingbird attested that the Defendant appeared intoxicated, and she identified herself, while still holding the liquor bottle.[10]

Kingbird testified that, because the Red Lake Indian Reservation prohibits alcohol, he could have arrested the Defendant for possession of alcohol. However,

---

[8]Kingbird testified that, when he first spotted the person in the doorway at the Lussier residence, he believed that the person was male, until he made closer contact, at which time, he identified the person as the Defendant.

[9]At the Hearing, Kingbird drew a diagram, in order to indicate the relative placement of the Lussier residence, his squad car, and the blue Chevy Blazer, at the time of the Defendant's arrest, and that drawing, Government Exhibit 7, was admitted into evidence, without objection by the Defendant.

[10]At the time of the Hearing, Kingbird identified the Defendant in the courtroom.

Kingbird also knew that the Defendant was a suspect in the stabbing of F.J.W. and C.J.H., and he knew that the blue Chevy Blazer had been identified as a suspect vehicle. Accordingly, Kingbird detained the Defendant, and he ran a Warrant check, which disclosed an outstanding Tribal Warrant for the Defendant's arrest. On cross-examination, Kingbird testified that he did not ask the Defendant any questions, he did not conduct a pat search, and he did not see any blood on the Defendant. Kingbird also clarified, that he arrested the Defendant for possession of liquor, and for the outstanding Tribal Warrant, although he averred that the Defendant's suspected involvement in the stabbing provided an additional basis for her arrest.

According to Kingbird, Black Weasel arrived on the scene, and transported the Defendant to the Red Lake Jail for booking, while Kingbird emptied out the liquor bottle. Once Black Weasel left with the Defendant, Kingbird responded to a dispatch call from the Redby area of the Red Lake Indian Reservation. Kingbird did not look into the blue Chevy Blazer before leaving for Redby. However, by the time Kingbird arrived in Redby, the call had been resolved, so Kingbird returned to the Lussier

residence. According to Kingbird, he was gone from the Lussier residence for approximately ten (10) minutes.[11]

In his testimony, Kingbird averred that he intended to tow the blue Chevy Blazer, pursuant to departmental policy, both because it was parked in the yard of the Lussier residence, and because of the vehicle's suspected involvement in the stabbing. When Kingbird approached the blue Chevy Blazer, he used a flashlight to look into its windows. From the driver's window, Kingbird observed the closed handle of a butterfly knife, in a compartment on the driver's door and, from the front passenger's window, he observed a set of brass knuckles, which were illegal on the Red Lake Indian Reservation. Kingbird then opened the unlocked door of the blue Chevy Blazer, in order to photograph the vehicle's interior. See, <u>Defendant Exhibits 2, 3, 4, and 5</u>.[12]

---

[11]During re-direct examination, Kingbird testified that he relies upon his experience, training, and judgment, to determine the priority of emergency calls.

[12]At the Hearing, Kingbird testified that he provided the photographs to Brian Peterson, who is a criminal investigator with the Red Lake Police Department. Counsel for the Government advised that he had not, as yet, received those photographs, but that he would provide a copy of the photographs to counsel for the Defendant, upon their receipt. In addition, the parties agreed to keep the Record open, solely to introduce the photographs as evidence, for purposes of the Defendant's Motion to Suppress. By letter dated July 17, 2009, counsel for the Defendant

(continued...)

At that time, Leonard Red Cloud ("Red Cloud"), who is the acting Captain of the Red Lake Police Department, arrived at the Lussier residence. According to Kingbird, Red Cloud was aware of the assault on F.J.W. and C.J.H., based upon his monitoring of radio traffic, and Kingbird advised Red Cloud that he had seen a knife in the blue Chevy Blazer. Red Cloud then instructed Kingbird to have the vehicle towed, so Kingbird waited, at the Lussier residence, for the towing company, and then escorted the blue Chevy Blazer to the Red Lake Police Department.

At the Hearing, the Government also adduced the testimony of Red Cloud, who confirmed that Patrol Officers are directed to call him, whenever a major crime occurs on the Red Lake Indian Reservation. Accordingly, on April 12, 2009, Red Cloud received a call from LaPlant, who was at the Red Lake Hospital, and who advised that a male victim, who was later identified as J.T.M., was near death, after a serious stabbing. By the time Red Cloud arrived at the Red Lake Hospital, J.T.M. had died from his injuries. Red Cloud then met with the hospital security guard, who provided surveillance video, from the hospital parking lot. Red Cloud, LaPlant, and the Security Guard, watched the video, which showed a red and white pick-up truck

---

[12](...continued)
submitted the photographs, as Defendant Exhibits 2, 3, 4, and 5.

pulling into the hospital parking lot, before coming to a stop outside the hospital door. According to Red Cloud, the driver jumped out of the truck, ran around to the passenger side, and dragged a person -- who was later identified as J.T.M. -- out of the vehicle. The driver then ran into the hospital, while leaving J.T.M. on the sidewalk. Once staff members exited the hospital, in order to attend to J.T.M., the driver, who was dressed all in black, left the hospital, in the red and white pick-up truck. However, the security guard obtained a partial license plate for the truck, from the occupant of a van that had been parked outside of the hospital.

While he was at the hospital, Red Cloud learned that Black Weasel had responded to another stabbing incident, involving two (2) victims -- namely, F.J.W. and C.J.H. Red Cloud then left the hospital, with the intention of looking for the red and white pick-up truck. However, Red Cloud heard, over the dispatcher's radio, that Kingbird had detained the blue Chevy Blazer, so Red Cloud traveled to the Lussier residence, in order to assist Kingbird. At that time, Red Cloud did not know whether the stabbing incidents were related.

Upon Red Cloud's arrival at the Lussier residence, he spoke with Kingbird, who related the events that had transpired at the Desjarlait residence, as well as the circumstances of the Defendant's arrest. Kingbird also advised that he had seen a

butterfly knife, in the driver's door handle of the blue Chevy Blazer. Red Cloud and Kingbird then used a flashlight to view the knife, first from the front passenger window, and then from the driver's window. Red Cloud testified that he did not open the car door in order to view the knife. At that point, Red Cloud directed Kingbird to secure the vehicle, and to have it towed for processing by a criminal investigator, based upon the presence of the weapon, and the suspected involvement of both the Defendant, and the vehicle, in the stabbing of F.J.W. and C.J.H. According to Red Cloud, the standard procedure of the Red Lake Police Department is to tow any vehicle, which has been involved in a major crime. Red Cloud testified that he then left to search for the red and white pick-up truck, and its driver, while Kingbird remained at the Lussier residence, awaiting the tow truck.

B.    The Search Warrant for the Blue Chevy Blazer. On April 15, 2009, after the blue Chevy Blazer had been towed to the Red Lake Police Department, law enforcement applied for, and obtained, a Search Warrant for the vehicle. See, Government Exhibits 1-2.[13] In his Affidavit and Application for the Search Warrant,

---

[13]At the time of the Hearing, the Search Warrant for the blue Chevy Blazer, together with its supporting Application and Affidavit, were admitted into evidence, without objection by the Defendant, who stipulated to the foundation for those Exhibits. See, Government Exhibits 1-2. The Defendant further conceded that the
(continued...)

Michael J. Iverson ("Iverson"), who is a Special Agent with the Federal Bureau of Investigation ("FBI"), averred that the FBI was advised, on April 12, 2009, of a stabbing on the Red Lake Indian Reservation. See, <u>Government Exhibit 1</u>, at ¶3. On that date, Iverson and Robert L. Mertz ("Mertz"), who is also a Special Agent with the FBI, responded to the Red Lake Hospital, with investigators from the Red Lake Police Department. <u>Id.</u>

According to Iverson, the attending physician in the emergency room reported that an unidentified male ran into the emergency room and screamed, "You have a dead [expletive] out here!" <u>Id.</u> at ¶4. The unidentified male then ran back outside, and sped away in a red and white pick-up truck. <u>Id.</u> According to the attending physician, emergency room staff rushed out to the parking lot, where they found J.T.M., who was an enrolled member of the Red Lake Band of Chippewa Indians. <u>Id.</u> at ¶¶5, 22. Resuscitation efforts were unsuccessful, and Dr. John Pieniazek ultimately informed Mertz that J.T.M. died at 11:05 o'clock p.m., due to a single stab wound to the chest. <u>Id.</u> at ¶5.

---

[13](...continued)
Search Warrant was executed in good faith. See, <u>Hearing Transcript</u>, <u>Docket No. 36</u>, at p. 81.

Iverson also averred that, while at the Red Lake Hospital, law enforcement agents were approached by an identified individual ("Source 1"), who reported that J.T.M. had been stabbed at the residence of Jilleen Jones, also known as GiGi Jones ("Jones"), in the McBride area of the Red Lake Indian Reservation.  <u>Id.</u> at ¶6. Source 1 also advised law enforcement that the Defendant "was rumored to have been involved in the stabbing."  <u>Id.</u>

According to Iverson, on April 13, 2009, the day after the stabbing, law enforcement located the red and white pick-up truck, that had dropped J.T.M. off at the hospital, and R.E.L., who was the driver of the truck, and who is J.T.M.'s cousin, was interviewed by law enforcement.  <u>Id.</u> at ¶7.  According to R.E.L., he was with J.T.M., at the residence of a female, when J.T.M. was stabbed.  <u>Id.</u> at ¶8.  Although R.E.L. was unable to see who had stabbed J.T.M., he reported that J.T.M. was near several unidentified females when he was stabbed, and he further reported, that the females were driving a vehicle, which might have been a Jeep.  <u>Id.</u>

On April 13, 2009, law enforcement also interviewed Jones, at her residence. <u>Id.</u> at ¶9.  Jones confirmed that J.T.M., and R.E.L., had been at her residence, in the McBride area of the Red Lake Indian Reservation, on April 12, 2009, with Jamilyn

Fairbanks ("J. Fairbanks"),[14] and E.L.B.  Id. at ¶¶9, 20. According to Jones, at

approximately 10:30 o'clock p.m., J. Fairbanks' girlfriends, including Tricia Johns[15]

and K.K., stopped by her house, in a car.[16]  Id. at ¶10.  Jones then heard a fight near

the street, and she heard one girl, who she believed to be the Defendant, say, "I

shanked him!  I shanked him!"  Id.  Jones also heard J.T.M. say, "She stabbed me!"

Id.  According to Jones, the girls then drove away, and R.E.L. put J.T.M. in his truck,

and left.  Id.

      According to Iverson, on April 13, 2009, law enforcement also interviewed

E.L.B., at her residence, which is down the street from Jones' residence.  Id. at ¶13.

E.L.B. confirmed that at approximately 10:30 o'clock p.m., on April 12, 2009, she

was at Jones' residence with J.T.M. and R.E.L.  Id.  According to E.L.B., a powder

blue Jeep pulled up to Jones' residence, with three (3) girls inside.  Id. E.L.B. advised

law enforcement that she did not know who was in the powder blue Jeep, but she

---

[14]On the Record presented, it is not clear if Jennifer Fairbanks, and Jamilyn Fairbanks, are the same person.

[15]After the interview with Jones, law enforcement learned that the Defendant uses the name "Patricia Johns" as an alias, based upon her mother's last name.  See, Government Exhibit 1, at ¶15.

[16]Jones described the car as white, although she stated that she "couldn't remember for sure."  Government Exhibit 1, at ¶11.

thought one of them might have been a Brown.  Id.  After J.T.M. ran over to the

vehicle, E.L.B. heard a fight, and then she heard one of the girls say, "I shanked him

up.  I shanked him up."  Id.

After the interview of E.L.B., law enforcement were advised that the Red Lake

Police Department had a light blue Chevy Blazer in its custody, following the

unrelated arrest of the Defendant, on April 12, 2009.  Id. at ¶14.  According to

Iverson, the vehicle was registered to the Defendant, who is an enrolled member of

the Red Lake Band of Chippewa Indians, at an address in Red Lake.  Id. at ¶¶18-19.

By that time, the Defendant had been released from custody, and she had contacted

the Red Lake Police Department, in order to remove certain items from her vehicle.

Id. at ¶16.  Iverson averred that Mertz had looked into the vehicle's interior, from the

outside, and seen a switchblade knife, near the driver's inside door handle.  Id. at ¶17.

Based upon the foregoing, Iverson averred that probable cause existed to

conclude that, on April 12, 2009, J.T.M. had been unlawfully killed, with malice

aforethought, after being stabbed with a knife on the Red Lake Indian Reservation.

Id. at ¶22.  Iverson also averred that, based upon his training and experience, trace

evidence is often present at the scene, following a traumatic injury, including blood,

bodily fluids, hair, fibers, tissue, and DNA evidence.  Id. at ¶21.  Iverson attested that

trace evidence was likely to be found on, or in, the blue Chevy Blazer, as well as fingerprints of the victim, the perpetrator, or any witnesses.  Id.  Iverson also attested that any writing, records, or electronically stored information, as well items or documents of identification, such as bills, records, or personal documents, could establish the identity of any potential witnesses, who may have been present at or near the time of the crime.  Id.  As a result, Iverson averred that probable cause existed to conclude that evidence of J.T.M.'s murder would be found on, or in, the blue Chevy Blazer.  Id. at ¶23.

On April 15, 2009, the Search Warrant was duly issued by a Magistrate Judge within this District.  See, Government Exhibit 2.  The Search Warrant authorized a search of the blue Chevy Blazer for trace evidence, including blood, bodily fluids, hair, fiber, tissue, DNA evidence, and latent fingerprints of J.T.M., on or inside the vehicle; all items that could contain trace evidence, or that could show someone's presence in the vehicle at or around the time of J.T.M.'s stabbing; instruments of weaponry, including knives or other objects which could have been used to stab J.T.M.; writings, recordings, photographs, electronically stored information, including that contained in cellular telephones, which would tend to show the motive for the crime, or the ownership, control, or occupancy of the vehicle at the time of J.T.M.'s

stabbing; and items or documents of identification, including bills, records, personal documents, or any notations, which could indicate ownership or control of the vehicle. Id., Attachment A. The Search Warrant also authorized law enforcement to take photographs and video, and to make scale drawings, in connection with the search. Id.

The Return indicates that law enforcement took a number of photographs, and seized several pieces of evidence, including a black butterfly knife from the armrest of the driver's door, and brass knuckles from the area between the front passenger seat and the door. Id., Photographic Log and Evidence Recovery Log. In addition, law enforcement seized several receipts from the console, and a wallet, which contained cash and an EBT card, from the inside pocket of the driver's door. Id., Evidence Recovery Log. Law enforcement also took several swabs from the driver's area, including the door handle, armrest, and steering wheel, id., and found seven (7) latent fingerprints, on and inside the vehicle. Id., Latent Print Lift Log.

C.     The Search Warrant for the Defendant's DNA. Subsequently, on April 24, 2009, law enforcement applied for, and obtained, a Search Warrant, which authorized the taking of a DNA sample from the Defendant, through the use of an oral

buccal swab.  See, <u>Government Exhibits 3-4</u>.[17]  In his Affidavit and Application for the Search Warrant, Mertz recounted the investigation into J.T.M.'s murder and, in this respect, his Affidavit is identical to the previous Affidavit of Iverson, which related to the Search Warrant for the blue Chevy Blazer.  See, <u>Government Exhibit 3</u>, at ¶¶1-20.  In addition, Mertz averred that, on April 15, 2009, officers executed a Search Warrant on the blue Chevy Blazer, and found a black-handled butterfly knife in the armrest of the driver's door.  <u>Id.</u> at ¶21.  According to Mertz, latent fingerprints, and a small amount of suspected blood, were visible on the blade of the knife.  <u>Id.</u>

Mertz also attested that, on April 15, 2009, he interviewed K.K., who confirmed that she traveled to Jones' residence with the Defendant, in a blue Blazer, on the evening of April 12, 2009.  <u>Id.</u> at ¶22.  Upon their arrival, K.K., and the Defendant, got out of the blue Blazer, and J.T.M., and the Defendant, started quarreling, and pushing one another.  <u>Id.</u>  K.K. informed Mertz that she did not see J.T.M. get stabbed, but "she knew Patricia Brown did it because she and JTM were the only two

---

[17]At the time of the Hearing, the Search Warrant for the Defendant's DNA sample, together with its supporting Application and Affidavit, were admitted into evidence, without objection by the Defendant, who stipulated to the foundation of those Exhibits.  See, <u>Government Exhibits 3-4</u>.  The Defendant further conceded that the Search Warrant was executed in good faith.  See, <u>Hearing Transcript</u>, <u>Docket No. 36</u>, at p. 81.

standing there and that afterwards Patricia Brown said, 'I stabbed him, I stabbed him.'" Id.

K.K., and the Defendant, then left Jones' residence in the blue Blazer, and they traveled a short distance to another residence, where K.K. saw the Defendant stab two (2) other individuals. Id. According to Mertz, in a subsequent interview, K.K. described the knife which the Defendant used in the assaults, and that description was consistent with the knife that was recovered during the search of the Defendant's blue Chevy Blazer. Id. Mertz also attested that, on April 16, 2009, a Warrant had been issued for the arrest of the Defendant, based upon the murder of J.T.M. Id. at ¶23.

Based upon his experience and training, Mertz attested that DNA evidence could be used to identify individuals who have handled an object, and he averred that skin cells, which contain DNA, were likely deposited on the knife that had been found in the Defendant's blue Chevy Blazer. Id. at ¶24. Accordingly, Mertz sought a Search Warrant, in order to obtain a DNA sample from the Defendant, through the use of an oral buccal swab, for laboratory analysis and comparison. Id. On April 24, 2009, a Search Warrant was duly issued by a Magistrate Judge in this District, for a DNA sample from the Defendant. See, Government Exhibit 4.

In her Motion to Suppress, see, <u>Docket No. 28</u>, the Defendant challenges the warrantless search of the blue Chevy Blazer, and she seeks the suppression of the evidence which was found in that search, including the knife. See, <u>Defendant's Memorandum in Support</u>, <u>Docket No. 39</u>, at p. 5. We further understand the Defendant to argue that her DNA sample must be suppressed, as the product of the allegedly unlawful vehicle search, and because the Search Warrant was unsupported by probable cause. <u>Id.</u> The Government opposes the Motion, and we address the parties' arguments in turn.[18]

---

[18]In her memorandum, the Defendant has addressed the Supreme Court's recent decision in <u>Arizona v. Gant</u>, --- U.S. ---, 129 S. Ct. 1710 (2009). There, the Court addressed the constitutionality of vehicular searches incident to arrest, and it held that "[p]olice may search a vehicle incident to a recent occupant's arrest **only** if the arrestee is within reaching distance of the passenger compartment at the time of the search **or** it is reasonable to believe the vehicle contains evidence of the offense of arrest." <u>Id.</u> at 1723 [emphasis added]. The Court further held that, "[w]hen these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant **or show that another exception to the warrant requirement applies**." <u>Id.</u> at 1723-1724 [emphasis added].

Here, the testimony of Black Weasel, and Kingbird, establishes that the Defendant was arrested outside of the blue Chevy Blazer, based upon an outstanding Tribal Warrant, and a misdemeanor violation for possession of alcohol, and **not** for the alleged assaults of J.T.M., F.J.W., and C.J.H. Cf., <u>United States v. Barnum</u>, 564 F.3d 964, 970 (8th Cir. 2009)("Officer Hatler could have properly searched Barnum's rental vehicle, without his consent, for further evidence relevant to the drug offense for which Barnum had been arrested."). Moreover, Kingbird searched the vehicle,

(continued...)

- 23 -

### III.  Discussion

A.    The Warrantless Search of the Defendant's Vehicle.

1.    Standard of Review.  "Searches without a warrant are per se unreasonable subject to a few well established exceptions."  United States v. Hill, 386 F.3d 855, 858 (8th Cir. 2004).[19]  One such exception is implicated by the "plain view"

---

[18](...continued)
after the Defendant had been transported to the Red Lake Jail by Black Weasel.  Cf. United States v. Hrasky, 567 F.3d 367, 368 (8th Cir. 2009)("[U]nder the rule announced in Gant, the search of Hrasky's vehicle violated the Fourth Amendment, because Hrasky was handcuffed in a law enforcement vehicle at the time of the search.").  However, in opposing the Defendant's Motion, the Government does not attempt to justify the warrantless search of the blue Chevy Blazer as a search incident to the Defendant's arrest.  Rather, the Government focuses on the plain view doctrine, and the automobile exception to the Warrant requirement.  Accordingly, the Supreme Court's decision in Gant has no bearing on the Defendant's current Motion, and we do not address Gant further.

[19]At the Hearing, Kingbird, and Red Cloud, testified that the blue Chevy Blazer was towed pursuant to departmental policy, but they did not offer any testimony concerning the Red Lake Police Department's policy on inventory searches.  In fact, in its opposition to the Defendant's Motion, the Government has not attempted to justify the search of that vehicle as an inventory search.  See, United States v. Kimhong Thi Le, 474 F.3d 511, 515 (8th Cir. 2007), cert. denied, 550 U.S. 969 (2007)("Law enforcement may search a lawfully impounded vehicle to inventory its contents without obtaining a warrant."), citing South Dakota v. Opperman, 428 U.S. 364, 376 (1976); see also, United States v. Pappas, 452 F.3d 767, 771 (8th Cir. 2006)("An inventory search by police prior to the impoundment of a vehicle is generally a constitutionally reasonable search.").  Nor has the Government argued that the evidence would have been discovered, pursuant to the inevitable discovery
(continued...)

doctrine, which permits the lawful seizure of incriminating evidence, that is in the "plain view" of the searching officers. As explained in United States v. Murphy, 69 F.3d 237, 241-42 (8th Cir. 1995), cert. denied, 516 U.S. 1153 (1996):

> The plain view doctrine allows police officers to seize evidence without a warrant when (1) "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," (2) the object's incriminating character is immediately apparent, and (3) the officer has "a lawful right of access to the object itself." United States v. Hughes, 940 F.2d 1125, 1126-27 (8th Cir. [1991])(quoting Horton v. California, [496 U.S. 128, 136-37] (1990)), cert. denied, [502 U.S. 896] (1991).

"The 'immediately apparent' requirement means that officers must have 'probable cause to associate the property with criminal activity.'" United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996), quoting United States v. Garner, 907 F.2d 60, 62 (8th Cir. 1990), cert. denied, 498 U.S. 1068 (1991). Of course, "[p]robable cause demands not that an officer be 'sure' or 'certain' but only

---

[19](...continued)
doctrine, in connection with any inventory search. See, United States v. Alvarez-Gonzalez, 319 F.3d 1070, 1072 (8th Cir. 2003)(holding that, "[f]or the inevitable discovery doctrine to apply, there must have been a reasonable probability the evidence would have been discovered in the absence of police misconduct, and the police must have been pursing a substantial, alternative line of investigation," and concluding that "the firearm would have been inevitably discovered during an inventory search of the vehicle."). Accordingly, we do not address those exceptions to the Warrant requirement further.

that the facts available to a reasonably cautious man would warrant a belief 'that

certain items may be contraband or stolen property or useful as evidence of a crime.'"

Id., quoting United States v. Garner, supra at 62, quoting, in turn, Texas v. Brown, 460

U.S. 730, 742 (1983).

Furthermore, in the context of automobiles, our Court of Appeals has reiterated:

> As long as law enforcement officials have probable cause,
> they may search an automobile without a warrant under the
> automobile exception. See Pennsylvania v. Labron, [518
> U.S. 938, 940] (1996); [United States v.] Martinez, 78 F.3d
> [399] at 401 [(8th Cir. 1996)]. Probable cause exists when,
> given the totality of the circumstances, a reasonable person
> could believe there is a fair probability that contraband or
> evidence of a crime would be found in a particular place.
> See Illinois v. Gates, [462 U.S. 213, 238] (1983).

United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

"It is the characteristic mobility of all automobiles, not the relative mobility of the car

in a given case, that * * * allows for warrantless searches when probable cause exists."

United States v. Perry, 925 F.2d 1077, 1080 n. 4 (8th Cir. 1991), cert. denied, 502 U.S.

849 (1991), citing United States v. Ross, 456 U.S. 798, 804-809 (1982); see also,

United States v. Blaylock, 535 F.3d 922, 926 (8th Cir. 2008), petition for cert. filed

(U.S., March 30, 2009)("No exigency beyond that created by the ready mobility of an

automobile is required for a warrantless search of a car to fall within the exception."),

citing <u>Pennsylvania v. Labron</u>, supra at 940. In addition, warrantless searches are permitted because "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." <u>United States v. Blaylock</u>, supra at 926, quoting <u>South Dakota v. Opperman</u>, 428 U.S. 364, 367 (1976).

      2.   <u>Legal Analysis</u>. Here, there is no dispute that Kingbird was properly in the yard of the Lussier residence, based upon his response to Lussier's call for police assistance. See, <u>United States v. Tarantola</u>, 332 F.3d 498, 499 (8th Cir. 2003), cert. denied, 540 U.S. 1066 (2003)("It cannot seriously be disputed that the officers had a right to enter the laundromat to investigate the 911 telephone call."); <u>United States v. Cunningham</u>, 133 F.3d 1070, 1072-1073 (8th Cir. 1998), cert. denied, 523 U.S. 1131 (1998)(concluding that "the police had a right to enter the apartment to investigate the 911 call"). Based upon his earlier conversation with Black Weasel, at the Desjarlait residence, Kingbird knew that F.J.W., and C.J.H., had been stabbed, he knew that the Defendant was a suspect, and he knew that the Defendant had fled the scene in a blue Chevy Blazer.

Within moments after his arrival at the Lussier residence, Kingbird arrested the Defendant, in close proximity to the blue Chevy Blazer. Kingbird subsequently used a flashlight to look into the windows of the vehicle, and he saw both the handle of a

butterfly knife, and a set of brass knuckles, in plain view. On the Record presented, there can be no doubt that a reasonably cautious person would be warranted in believing that the knife constituted evidence of the assault against F.J.W., and C.J.H. Moreover, Kingbird testified that the incriminating character of the brass knuckles was immediately apparent, because brass knuckles are considered an unlawful, dangerous weapon on the Red Lake Indian Reservation.

Our Court of Appeals has repeatedly held that "[t]he act of looking through a car window is not a search for Fourth Amendment purposes because 'a person who parks a car -- which necessarily has transparent windows -- **on private property** does not have a reasonable expectation of privacy in the visible interior of [her] car.'" United States v. Bynum, 508 F.3d 1134, 1137 (8th Cir. 2007)[emphasis added], quoting United States v. Hatten, supra at 261, citing, in turn, Texas v. Brown, supra at 740; see also, United States v. Gillon, 348 F.3d 755, 759-60 (8th Cir. 2003), cert. denied, 541 U.S. 968 (2004); United States v. Beatty, 170 F.3d 811, 814 (8th Cir. 1999).[20] This is true even when the occupants had exited their vehicles at the time that

_____

[20]The Defendant argues that the automobile exception is inapplicable, when a vehicle is parked at a residence. See, Defendant's Memorandum in Support, supra at p. 10. However, as noted by the Government, that argument is inconsistent with the Supreme Court's subsequent holding in Pennsylvania v. Labron, 518 U.S. 938, 940
(continued...)

the officers looked through the windows.  Id.; United States v. Beatty, supra at 814.

"'All that is required is that at the time the officers observed the [contraband] in the car, they must have had a right to be in close proximity to the car at a point from which the observation occurred.'"  United States v. Hatten, supra at 260, quoting United States v. Webb, 533 F.2d 391, 394 (8th Cir. 1976).  "'[A] truly cursory inspection -- one that involves merely looking at what is already exposed to view * * * -- is not a "search" for Fourth Amendment purposes, and therefore does not even require reasonable suspicion.'"  Id. at 261, quoting Arizona v. Hicks, 480 U.S. 321, 328 (1987).

In United States v. Beatty, supra, the defendant argued that, since he and his passenger had already exited the truck, the officer had no justification for reapproaching the vehicle to look inside.  The Court rejected that argument, and stated

---

[20](...continued)
(1996)("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more."), as interpreted by our Court of Appeals.  See, United States v. Blaylock, 535 F.3d 922, 926 (8th Cir. 2008), petition for cert. filed (U.S., March 30, 2009)(upholding the search of a vehicle, which was parked in a residential driveway, under the automobile exception); United States v. Reinholz, 245 F.3d 765, 777 (8th Cir. 2001), cert. denied, 534 U.S. 896 (2001)(upholding the search of a vehicle, which was parked in a residential driveway, under the plain view doctrine, and the automobile exception); United States v. Fladten, 230 F.3d 1083, 1086 (8th Cir. 2000)(same).

that, "[i]n order to look inside the truck, [the officer] did not need 'probable cause, or even reasonable suspicion that crime [was] afoot.'" Id. at 814, quoting United States v. Hatten, supra at 260. Similarly, in United States v. Gillon, supra, the defendant was seated in the back of the patrol car, when the officers approached the vehicle, and looked through the car's window. The Court applied the plain view doctrine, and stated that "the officer's activity in looking in the window of the car was lawful in any case." Id. at 759-60 (finding that the police were lawfully in close proximity to the vehicle, where they had executed a traffic stop of the defendant on a public road); see also, United States v. Reinholz, 245 F.3d 765, 777 (8th Cir. 2001), cert. denied, 534 U.S. 896 (2001)(upholding a vehicular search under the plain view doctrine because, "[w]hen the police executed the valid search warrant on Reinholz and Chevalier's residence the Honda Prelude was sitting in the driveway and drug paraphernalia was immediately apparent through the car's windows."); United States v. Fladten, supra at 1086 (same).

Here, Kingbird traveled to the Lussier residence in response to a call for assistance. The blue Chevy Blazer was parked in the yard of the residence, and Kingbird looked into its windows, at which point, he saw the incriminating evidence in plain view. The fact that Kingbird used a flashlight to illuminate the incriminating

evidence is not of constitutional importance. See, <u>United States v. Lee</u>, 274 U.S. 559, 563 (1927)("Such use of a searchlight is comparable to the use of a marine glass or a field glass," and "is not prohibited by the Constitution."); <u>United States v. Hatten</u>, supra at 261 ("It does not matter that Officer Pfeffer used a flashlight."), citing <u>United States v. Garner</u>, supra at 62 n. 2; <u>United States v. Trower</u>, 285 Fed.Appx. 321, 324 (8th Cir. 2008)("We attach no importance to the fact that [Officer] Rorebeck used a flashlight."), citing <u>United States v. Dunn</u>, 480 U.S. 294, 305 (1987); <u>United States v. McKibben</u>, 928 F. Supp. 1479, 1481 (D.S.D. 1996)("The officer's actions in looking through the vehicle's open window, even with the aid of a flashlight, did not constitute a 'search.'").

Moreover, based upon his legal discovery of the knife, and the brass knuckles, we conclude that Kingbird had probable cause to search the vehicle, even without a warrant. See, <u>United States v. Terry</u>, 400 F.3d 575, 581 (8th Cir. 2005)("The legal discovery of the contraband ammunition in Mr. Terry's vehicle sufficed to create probable cause for Officer Hawk to believe that other parts of the vehicle contained additional contraband or evidence."); <u>United States v. Smart</u>, 393 F.3d 767, 770 (8th Cir. 2005), cert. denied, 545 U.S. 1121 (2005)(The "officer's sighting of what appeared to be crack [in plain view] properly led to the vehicle search that uncovered

the firearm.").  By the time that Kingbird opened the door, in order to photograph the interior of the vehicle, he knew that the Defendant, and the blue Chevy Blazer, had been implicated in the assault on F.J.W., and C.J.H., and he had observed a knife, and a set of brass knuckles, in the vehicle.[21]

Based upon those facts, a reasonable officer would have probable cause to conclude that the vehicle contained evidence of a crime.  As a result, Kingbird was entitled to conduct a warrantless search of the vehicle.  In sum, and in view of the totality of the Record presented, we find that no constitutional violation occurred, and that the evidence seized from the blue Chevy Blazer is admissible, under the plain view doctrine, and the automobile exception.  As a result, we recommend that the

---

[21]We reject the Defendant's argument, which is unsupported by any legal citation, that, since "there is nothing inherently illegal" about a knife handle, Kingbird could not search the vehicle unless "he had a good reason to believe that the **particular knife handle** he observed had been involved in criminal activity."  Defendant's Memorandum in Support, supra at p. 9 [emphasis added].  As noted in the Defendant's memorandum, "[p]robable cause demands not that an officer be 'sure' or 'certain' but only that the facts available to a reasonably cautious man would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.'" United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997), quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996), quoting, in turn, United States v. Garner, 907 F.2d 60, 62 (8th Cir. 1991), cert. denied, 498 U.S. 1068 (1991), quoting, in turn, Texas v. Brown, 460 U.S. 730, 742 (1983). We have no trouble in concluding that a reasonable officer could believe that the knife -- inclusive of its visible handle -- was evidence of a crime.

Defendant's Motion to Suppress be denied, with respect to the warrantless vehicle search.[22]

B.  The Search Warrant of the Defendant's DNA.

1.  Standard of Review.  The Fourth Amendment requires that "a search warrant must be issued by a neutral and detached magistrate," Technical Ordnance Inc. v. United States, 244 F.3d 641, 647 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002), citing Johnson v. United States, 333 U.S. 10, 13-14 (1948), who

---

[22]In view of our conclusion, that the automobile exception permitted an immediate search of the blue Chevy Blazer, we need not examine the Search Warrant, which was obtained after the vehicle had been towed to the Red Lake Police Department.  See, United States v. Rodriguez, 414 F.3d 837, 844 (8th Cir. 2005)("[P]robable cause existed to search the entire vehicle, and a search pursuant to the automobile exception to the Fourth Amendment may take place at a separate place and time."), citing United States v. Winters, 221 F.3d 1039, 1041 (8th Cir. 2000); United States v. Polar, 2004 WL 2980215 at *6 (D. Minn., December 15, 2004)("If * * * the police have probable cause to conduct a warrantless search of the vehicle at the time of the stop, the officers may tow the vehicle to a police station and search it at a reasonable later time."), citing United States v. Johns, 469 U.S. 478, 484 (1985), and United States v. Chaidez, 906 F.2d 377, 379 (8th Cir. 1990).  As detailed above, we find no violation of the Defendant's constitutional rights, based upon Kingbird's warrantless search of the vehicle.

Moreover, our review of the Search Warrant has not disclosed any fatal defects, and the Defendant concedes that the Warrant was executed in good faith.  See, United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999)(concluding that the officers' reliance upon the Search Warrant was reasonable, because it "was not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon."), citing United States v. Leon, 468 U.S. 897, 922-23 (1984).

will "assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband." <u>United States v. Winningham</u>, 953 F. Supp. 1068, 1077 (D. Minn. 1996), citing <u>Warden v. Hayden</u>, 387 U.S. 294 (1967); <u>United States v. Johnson</u>, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996). A finding of probable cause must be based upon a consideration of all of the circumstances set forth in the supporting Affidavit, and is proper when a "'fair probability [exists] that * * * evidence of a crime will be found in a particular place,'" or when "'a substantial basis [exists] for * * * conclud[ing]' that a search would uncover evidence of wrongdoing." <u>United States v. Horn</u>, 187 F.3d 781, 785 (8th Cir. 1999), cert. denied, 529 U.S. 1029 (2000), quoting <u>Illinois v. Gates</u>, supra at 236, 238, quoting, in turn, <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960), overruled on other grounds by <u>United States v. Salvucci</u>, 448 U.S. 83 (1980); see also, <u>United States v. Gladney</u>, 48 F.3d 309, 313 (8th Cir. 1995); <u>United States v. Tagbering</u>, 985 F.2d 946, 949 (8th Cir. 1993).

Probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts" and, as such, is "not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, supra at 232; see also, <u>Cooper Industries,</u>

Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 435 (2001); Ornelas v. United States, 517 U.S. 690, 697 (1996). In considering the issuance of a Search Warrant, probable cause must be viewed under a reasonableness standard, "the touchstone of the Fourth Amendment," which "is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996), quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991).

Search Warrant "[a]pplications and affidavits should be read with common sense and not in a grudging, hyper technical fashion." Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998); United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993). "In conducting such an examination, the Court should review the affidavits as a whole, and not on a paragraph-by-paragraph basis." United States v. Winningham, supra at 1077, citing United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991); United States v. Townsley, 843 F.2d 1070, 1076-77 (8th Cir. 1988). Under the Fourth Amendment's preference for searches conducted pursuant to Warrants, see, Illinois v. Gates, supra at 236, Courts reviewing Search Warrants are to "accord great deference to the decision of the Judicial Officer who issued the Warrant," and must not engage in a de novo review. United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); see also, Walden v. Carmack, supra at 870.

2.  Legal Analysis.  Here, given the averments contained in Mertz's Affidavit in support of the issuance of the Search Warrant, there is unquestionably probable cause to obtain a DNA sample from the Defendant.  See, Government Exhibits 3-4.  In his Affidavit, Mertz recounted the events leading to the Defendant's arrest, including the death of J.T.M., and the initial tip from Source 1, who advised that J.T.M. had been stabbed at Jones' residence, in the McBride area of the Red Lake Indian Reservation, and that the Defendant had been involved in that stabbing.

When probable cause for a Search Warrant is based upon information provided by an informant, "'a key issue is whether that information is reliable.'"  United States v. Koons, 300 F.3d 985, 993 (8th Cir. 2002), quoting United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998); see also, United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)("[T]he informant's reliability, veracity, and basis of knowledge are relevant considerations -- but not independent, essential elements -- in finding probable cause.").  As our Court of Appeals has stated:

> In [Illinois v.] Gates, the Supreme Court explained that an informant's reliability and basis of knowledge "are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations:  a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other

> indicia of reliability." * * * 462 U.S. at 233, 103 S.Ct. at
> 2329.

United States v. Olson, 21 F.3d 847, 850 (8th Cir. 1995), cert. denied, 513 U.S. 888 (1994).

As a result, "'an informant's basis of knowledge [is] an important consideration, but not a rigid requirement, in the probable cause determination.'" Id., citing United States v. Anderson, supra at 615.

Consequently, the "core question" is whether the information, which had been provided by the informant, was reliable. See, United States v. Williams, supra at 593 ("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable."). Moreover, "[t]he statements of a reliable confidential informant are themselves sufficient to support probable cause." United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998), cert. denied, 525 U.S. 919 (1998). In turn, an informant is deemed reliable when his or her statements are corroborated by independent evidence. See, United States v. Carpenter, 341 F.3d 666, 669 (8th Cir. 2003) ("[C]orroboration of minor, innocent details may support finding of probable cause."), citing United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001); see also, United States v. Formaro, 152 F.3d 768, 770 (8th Cir.

1998)("[C]orroboration of the confidential informant's information by independent investigation is an important factor in the calculus of probable cause.").

In his Affidavit, Mertz detailed the interviews of several witnesses, including R.E.L., who confirmed that J.T.M. had been stabbed at Jones' residence, as well as Jones, E.L.B., and K.K., who identified the Defendant as J.T.M.'s assailant. This independent investigation by law enforcement corroborated the information that had been provided by Source 1. Beyond that, Mertz averred that Source 1 was known to law enforcement. See, United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005), quoting Florida v. J.L., 529 U.S. 266, 270 (2000)("[A] known informant * * * can be held responsible if [his or her] allegations turn out to be fabricated.").

We find that the information, which had been provided by Source 1, as well as the other witnesses, undergirds our finding that the Search Warrant was supported by probable cause. In addition, Mertz related that the blue Chevy Blazer was registered to the Defendant, and that a search of the vehicle had revealed a switchblade knife, with visible latent fingerprints, and a small amount of suspected blood. Mertz further averred that the knife was consistent with K.K.'s description of the weapon, which the Defendant had allegedly used in the assault on J.T.M. Lastly, Mertz attested, based upon his experience and training, that DNA evidence can be used to identify

individuals who have handled an object, and he averred that skin cells, which contain DNA, were likely deposited on the knife that was found in the Defendant's blue Chevy Blazer. On these averments, we find that there was adequate probable cause to support the issuance of the Search Warrant for the Defendant's DNA.[23]

The Defendant draws no other infirmity in the Warrant to our attention, and our own independent review fails to disclose any. We understand the Defendant to argue that her DNA evidence was obtained after Kingbird had conducted a warrantless search of the blue Chevy Blazer, in violation of the Fourth Amendment. However, as we have previously detailed, we find that no violation of the Fourth Amendment occurred during the search of the vehicle, or in the seizure of the knife. Accordingly, we recommend that the Defendant's Motion to Suppress be denied in all respects.

NOW, THEREFORE, It is --

---

[23]Even if the information in the Search Warrant was insufficient to establish probable cause, we would be compelled, by the law of this Circuit, to find that Mertz's reliance upon the Search Warrant was reasonable, because the Warrant was "not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999), citing United States v. Leon, 468 U.S. 897, 922-23 (1984). Indeed, the Defendant concedes that the Search Warrant was executed in good faith. Accordingly, even if probable cause were lacking, we would still recommend that the Defendant's Motion be denied.

RECOMMENDED:

That the Defendant's Motion to Suppress Obtained as a Result of Search and Seizure [Docket No. 28] be denied.

Dated:  July 30, 2009                    *s/Raymond L. Erickson*
                                         Raymond L. Erickson
                                         CHIEF U.S.  MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **August 14, 2009**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing by no later than **August 14, 2009**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.